## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NEAL D. BARNARD, M.D., | ) |
| Plaintiff, | ) |
| v. | ) Case No.: 06-CV-1393 (CKK) |
| DEPARTMENT OF HOMELAND SECURITY, | ) |
| Defendant. | ) |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to FED. R. CIV. P. 56 and Local Rules 7(h) and 56.1, Plaintiff hereby moves for summary judgment. In support of the motion, Plaintiff refers the Court to the attached Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment, the Statement of Material Facts as to Which There is No Genuine Issue, the Declaration of Neal D. Barnard, M.D., and the accompanying exhibits. The Statement of Material Facts as to Which There is No Genuine Issue also contains Plaintiff's Response to Defendant's Statement of Material Facts. A proposed order consistent with the relief sought is also attached.

Respectfully submitted,

/s/ Daniel Kinburn

_____
Daniel Kinburn
PHYSICIANS COMMITTEE FOR
 RESPONSIBLE MEDICINE
5100 Wisconsin Avenue, N.W., Suite 400
Washington, D.C. 20016
Attorney for Plaintiff
(202) 686-2210 ext. 308
(202) 686-2155 (fax)

Dated: March 15, 2007

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NEAL D. BARNARD, M.D., | ) |
| Plaintiff, | ) |
| v. | ) Case No.:  06-CV-1393 (CKK) |
| DEPARTMENT OF HOMELAND SECURITY, | ) |
| Defendant. | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN
## SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
## OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

This memorandum is submitted in support of Plaintiff's Motion for Summary Judgment and in opposition to Defendant's Motion for Summary Judgment. Plaintiff Neal D. Barnard, M.D., seeks summary judgment against Defendant Department of Homeland Security ("DHS") for its failure to provide Dr. Barnard with certain records requested pursuant to the Freedom of Information Act ("FOIA") and the Privacy Act (collectively "FOIA/PA"). Defendant acknowledges that it has searched for and found six pages of responsive records and alleges that portions of these documents are exempt from disclosure in accordance with certain FOIA exemptions pertaining to records maintained as part of an ongoing criminal investigation. Defendant has withheld these records in their entirety, claiming that the exempt and non-exempt portions are inextricably intertwined.

As demonstrated below, Defendant has failed to meet its burden of proving that it properly withheld the requested records as exempt due to an ongoing criminal investigation because Defendant's supporting declaration relies, in part, upon inadmissible hearsay. Defendant

has failed to provide a declaration made upon personal knowledge establishing that Dr. Barnard, in truth and in fact, currently is the subject of an ongoing criminal investigation, and therefore Defendant's declaration is insufficient to achieve summary judgment on this ground. Furthermore, Defendant has failed to demonstrate that any and all exempt portions of the withheld records could not be segregated from the non-exempt portions. Defendant has relied upon wholly conclusory statements that restate the legal standards for non-segregability and for the exemptions that Defendant has claimed. Accordingly, this Court should grant summary judgment in Plaintiff's favor, enter an order enjoining Defendant to provide the requested records, and deny Defendant's motion for summary judgment.

## II.    STATEMENT OF FACTS

Dr. Barnard is the president and founder of the Physicians Committee for Responsible Medicine ("PCRM"), a 501(c)(3) public charity that advocates for preventive medicine through better nutrition and promotes more effective, ethical, and compassionate scientific research. (Barnard Decl. ¶ 1.) Dr. Barnard is the author of several dozen publications in scientific and medical journals as well as numerous nutrition books for lay readers, and he is frequently called on by news programs to discuss issues related to nutrition, research, and other areas of modern medicine. (*Id.*) His activities are reported to PCRM's membership of over 100,000 physician and lay members via PCRM's quarterly publication, *Good Medicine*, its Website, and regular mailings to its membership. (*Id.*)

Beginning in January 2003, with no explanation whatsoever, federal law enforcement officials began subjecting Dr. Barnard to detention and searches during international travel. (*Id.* ¶ 2.) In a time span of less than three years, Dr. Barnard was detained, questioned, and/or searched at least twelve times:

- January 4, 2003: U.S. Customs and Border Protection ("CBP") officials questioned, searched, and delayed Dr. Barnard for 20 minutes upon his return from vacation abroad. Officials informed him that his passport had been flagged for scrutiny;

- May 10, 2003: CBP officials detained Dr. Barnard at Toronto Pearson International Airport for 20 to 30 minutes, interrogated him about the nature of his work, and searched his belongings. At this time, Dr. Barnard observed "Terrorist Organization Member - Caution" in large block letters on the CBP computer screen;

- June 3, 2003: CBP officials searched and questioned Dr. Barnard at Dulles International Airport for 30 minutes upon his return from a vacation in Europe. Officials searched Dr. Barnard's baggage and removed, to make photocopies, a personal calendar and address book, correspondence, and a job applicant's résumé;

- July 16, 2003: CBP officials detained Dr. Barnard in the screening room at Toronto Pearson International Airport for questioning for more than 20 minutes;

- August 28, 2003: CBP officials, including Officers Weimer and Hanna, delayed and screened Dr. Barnard for 15 minutes at Toronto Pearson International Airport, at which time Dr. Barnard observed the "Terrorist Organization Member" notice on the CBP computer screen;

- January 3, 2004: CBP Officers Tweed and Grove stopped Dr. Barnard at Dulles International Airport upon his return from the United Kingdom and searched his baggage;

- September 10, 2004: Upon Dr. Barnard's return from a trip to Belgium and France, CBP Officer Berg marked a yellow line on Dr. Barnard's customs card, after which Officer Greskovic searched his baggage;

- January 1, 2005: CBP officials delayed Dr. Barnard for 30 minutes upon his return from a trip to the United Kingdom. After Officer Messina marked a yellow line on Dr. Barnard's customs card, Officers Cromwell and Perlas searched his baggage;

- May 13, 2005: Police officers briefly detained Dr. Barnard as he checked in with Air France at Dulles International Airport because his name appeared on a "no-fly" list;

- May 28, 2005: CBP officials delayed Dr. Barnard for 12 minutes at Dulles International Airport upon his return from France. Officer Wilkinson marked a yellow line on Dr. Barnard's customs card and Officers Stuart

and Greene, assisted by a third officer, checked his passport, after which
Officer Stuart searched his baggage;

- August 27, 2005: CBP Officers Ulloa, Miller, Comas, and Brodie delayed,
  questioned, and searched Dr. Barnard for 20 minutes at Dulles
  International Airport upon his return from Marseilles;

- September 22, 2005: While checking in at Dulles International Airport,
  Dr. Barnard learned from United Airlines that his name matched the name
  of a person on the "no-fly" list. Dr. Barnard was later sidelined for
  screening and inspected by Earle Biassey.

(*Id.* ¶¶ 3–14.) These incidents occurred during each and every one of Dr. Barnard's travels

abroad between January 2003 and September 2005. (*Id.* ¶ 15.)

Since filing the FOIA/PA request that led to the initiation of this lawsuit, Dr. Barnard has

been detained, questioned, and/or searched during international travel several more times:

- May 30, 2006: After returning from a trip to France and Croatia, Dr. Barnard's
  customs card was yellow-lined, and he was sent to stand in the line for baggage
  search. He was delayed for approximately 35 minutes.

- July 4, 2006: Dr. Barnard arrived at Dulles International Airport after a trip to
  London. Officer George yellow-lined his customs card, after which Officer
  Clerkin inspected his baggage.

- July 14, 2006: While returning to the United States from Toronto, Dr. Barnard
  was detained by officials at Toronto Pearson International Airport for two hours.
  Officer Mazzuoccolo screened his passport and escorted him to a waiting room,
  where Officers Watkins and Takak questioned him and asked him to fill out a
  form. They questioned Dr. Barnard about his employment, the reasons for his trip,
  and any location(s) where he had stayed in Canada. They later left Dr. Barnard in
  this room for an extended period while they awaited telephone authorization to
  release me.

- September 2, 2006: Upon his arrival at Dulles International Airport from a
  vacation trip to Italy, Dr. Barnard was initially screen by Officer Harvey, who did
  not initially yellow-line Dr. Barnard's customs card. After Dr. Barnard left the
  screening area and began waiting for his luggage, Officer Harvey approached
  him, took his passport, and marked a large "C" on his card. Officer Harvey then
  left for several minutes, after which he returned with the passport and told Dr.
  Barnard that he would need to undergo additional screening. Dr. Barnard
  proceeded to the additional screening area where Officers Cromwell and Wilson
  searched his luggage. This process lasted approximately 40 minutes.

- January 6, 2007: Upon Dr. Barnard's arrival at Dulles International Airport from a vacation in the United Kingdom, Officer Suarez conducted the initial passport screening and yellow-lined Dr. Barnard's customs card. After retrieving his checked luggage, Dr. Barnard was sent to lane C for questioning. There, Officer McEvoy read through the computer record, left for several minutes, returned with Dr. Barnard's passport, and allowed him to leave.

(*Id.* ¶¶ 16–20.)

Prior to January 2003, Dr. Barnard experienced no such problems and had no reason to think that he was considered by law enforcement authorities to be anything but a law-abiding citizen—certainly not a "Terrorist Organization Member." (*Id.* ¶ 21.) To the best of his knowledge Dr. Barnard never has been questioned, followed, or monitored by law enforcement officials in any manner other than that described above. (*Id.* ¶ 22.) No law enforcement agency has ever requested that Dr. Barnard provide records, fingerprints, or DNA samples for the purposes of an investigation of any sort. (*Id.* ¶ 23.) Similarly, Dr. Barnard knows of no occasion in which his friends, family members, or colleagues were questioned or monitored as a result of an investigation of his activities. (*Id.* ¶ 24.)

In an effort to put an end to these inconvenient and embarrassing interruptions to his travel schedule, Dr. Barnard, at various times, sought records pertaining to monitoring, surveillance, or investigation of his activities from a number of federal law enforcement authorities: U.S. Customs Service (January 9, 2003; August 8, 2003); Federal Bureau of Investigation ("FBI") (August 8, 2003; March 21, 2006); U.S. Customs and Border Protection ("CBP") (July 20, 2005); Immigration and Customs Enforcement ("ICE") (March 21, 2006); and Transportation Security Administration (July 13, 2006). (*Id.* ¶ 25; *see* Barnard Decl. Exs. 1–7.) Other than the instances described below, these requests failed to result in meaningful agency responses.

By letter dated January 16, 2003, and in response to Dr. Barnard's request of January 9, 2003, U.S. Customs Service informed Dr. Barnard that it had searched the Treasury Enforcement Communications System ("TECS") and identified two possible reasons for the change in "the routine nature of [his] Customs processing." (Barnard Decl. Ex. 1.) Customs cited both an "elevated level of scrutiny" due to the terrorist attacks of September 11, 2001, and a "random selection process that is directly based on travel frequency." (*Id.*) Customs did not report any ongoing criminal investigation of Dr. Barnard. (*See id.*)

On August 15, 2005, CBP responded to Dr. Barnard's request of July 20, 2005, advising that ICE owned and maintained the requested records and that Dr. Barnard should contact that office. (*See* Fields Decl. Ex. 2.) Thereafter, on March 21, 2006, Dr. Barnard filed a FOIA/PA request with ICE, an agency within DHS, for records relating to any monitoring, surveillance, observation, questioning, interrogation, and/or investigation of his activities from 2002, prior to the onset of his travel difficulties, until the date of the request. (*See* Barnard Decl. Ex. 6.) On May 16, 2006, Dr. Barnard filed an appeal with DHS after ICE took no action regarding his request. (*See* Barnard Decl. Ex. 8.) DHS then acknowledged the delay and notified him of his right to seek judicial review. (*See* Fields Decl. Ex 6.) On August 7, 2006, Dr. Barnard filed a Complaint for Injunctive Relief with this Court, seeking the requested records. (*See* Compl.)

After the filing of this lawsuit, Dr. Barnard received from ICE a letter dated August 5, 2006, in which ICE responded to the FOIA/PA request and advised Dr. Barnard that it had no responsive records. (Barnard Decl. ¶ 27; Fields Decl. Ex. 7.) Dr. Barnard then filed an administrative appeal of ICE's response and notified ICE of the filing of this lawsuit. (*See* Barnard Decl. ¶ 28.) Dr. Barnard's appeal challenged, as inadequate, ICE's search for records, arguing that if ICE truly possessed no responsive records, it must concede that it had consistently

6

targeted Dr. Barnard for detention and questioning twelve times in less than three years for "absolutely no reason." (*See* Barnard Decl. Ex. 9.) ICE subsequently provided a "supplemental response" to Dr. Barnard's request in which it stated, without confirming their existence, that any responsive records were exempt from disclosure in their entirety, pursuant to certain FOIA exemptions. (*See* Fields Decl. Ex. 9.)

Simultaneous to filing his FOIA/PA request with ICE, Dr. Barnard also filed a FOIA/PA request with the Federal Bureau of Investigation ("FBI") for records relating to any monitoring, surveillance, observation, questioning, interrogation, and/or investigation of his activities from January 1, 2000, until the time of the request, a period exceeding the span covered by his similar request to ICE. (*See* Barnard Decl. Ex. 4.) In response, FBI provided records showing that Dr. Barnard has been somehow involved in two FBI "investigations"[1]: the first took place during mid-1996, when Dr. Barnard received a death threat from an unknown source, and the second occurred in May 2000 when FBI researched a list of speakers scheduled to appear at a charity conference that year. (*See* Barnard Decl. Ex. 10.) The unredacted portions of FBI's 27-page response demonstrate that neither the 1996 nor the 2000 investigation is currently ongoing, in that all records associated with the "investigations" date from within a month of when FBI opened the "investigations." (*See id.*) Further, as support for redacting and withholding pages, FBI cited exemptions (b)(2) for agency personnel rules and practices, (b)(6) for privacy concerns for personnel and medical files, (b)(7)(C) for personal privacy, and (b)(7)(D) for the identities of and information provided by confidential sources, but not (b)(7)(A) or (b)(7)(E) (*see id.*), which likely would have been cited if there were a currently ongoing criminal investigation of Dr. Barnard.

---

[1]    FBI's response is too heavily redacted to determine if Dr. Barnard was the intended subject of the 2000 "investigation" or simply a person who might have some knowledge of the actual subject[s] of the investigation. For the 1996 "investigation," Dr. Barnard is more accurately described as the victim, not the subject.

III.    **ARGUMENT**

    A.    **Defendant's declaration improperly relies upon hearsay and therefore Defendant has failed to meet its burden of proving that it properly withheld the requested records.**

This Court cannot rely upon Defendant's statement in its declaration that there is an ongoing criminal investigation of Dr. Barnard, because as a matter of black letter evidence law that statement constitutes nothing more than inadmissible hearsay. Dr. Barnard concedes, for purposes of this litigation, that ICE is permitted to redact TECS record codes, code numbers, and administrative codes ("low (b)(2)"); Special Agent telephone numbers ("low (b)(2)"); codes for indexing and retrieving information ("high (b)(2)"); and identities of Special Agents ((b)(7)(C)). (*See* Def.'s Mot. Summ. J. at 7–10.) Further, Dr. Barnard concedes that if portions of the requested records pertain to an actual, currently ongoing criminal investigation, Defendant is entitled to withhold such portions of the records. However, Dr. Barnard challenges as improper Defendant's invocation of exemptions "high" (b)(2), (b)(7)(A), (b)(7)(C), and (b)(7)(E) because Defendant has not demonstrated that there is an ongoing criminal investigation of Dr. Barnard.

To be entitled to summary judgment in a FOIA lawsuit, an agency must prove that each document was produced, not withheld, is unidentifiable, or is exempt from disclosure. *Weisberg v. U.S. Dep't of Justice*, 627 F.2d 365, 368 (D.C. Cir. 1980). A court may grant summary judgment on the basis of agency affidavits "if the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show

affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P.
56(e).

Defendant's statement in its declaration alleging the existence of an ongoing
investigation of Dr. Barnard does not meet the requirements of Rule 56(e) because Mr. Fields
does not have personal knowledge of any such investigation. Mr. Fields simply reported
information that he retrieved from a "database used for storage, tracking, and retrieval of law
enforcement information" that is accessible by all ICE offices. (Fields Decl. ¶ 15.) Instead of
stating, as required, that "I have personal knowledge of an ongoing investigation in my
department," Mr. Fields essentially declared that "Someone said something about an
investigation of Dr. Barnard at some time that found its way into our database."

Because Mr. Fields has not testified to having personal knowledge of the information
retrieved from the TECS database, his statement regarding the existence of an ongoing
investigation is hearsay, which is defined as "a statement, other than one made by the declarant .
. . , offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). Given
that the records may have been prepared by one person using information provided by another,
Mr. Fields's statement may even constitute hearsay within hearsay. Moreover, Defendant has
failed to include any portions of the records upon which it relied in its declaration, despite the
mandate that "[s]worn or certified copies of all papers or parts thereof referred to in an affidavit
shall be attached thereto or served therewith." FED R. CIV. 56(e). In fact, Defendant has provided
no detail at all regarding the actual content, type, or source(s) of the information in the records at
issue. Therefore, the Court cannot make any determination regarding the trustworthiness of the
records, and their content cannot be offered for the truth of the matter asserted.

Defendant has not demonstrated that the hearsay exception for records of regularly conducted activity applies to records contained in the TECS database. Defendant has not shown, via a statement by the custodian of records, that the records in the TECS database are of the type kept by ICE in the course of its "regularly conducted business activity" and made by a person with knowledge at or near the time of the recorded events, as required by FED. R. EVID. 803(6). Defendant has not even suggested that the records at issue here originate with ICE, as opposed to some other federal or state agency. *See United States v. Davis*, 571 F.2d 1354, 1357 (5th Cir. 1978) ("[T]he information entered on the two ATF forms did not originate within the Bureau. ATF merely preserved the information as reported on the forms. Thus, it was questionable whether the documents were actually a part of the records of the Bureau's business and admissible under the rule 803(6) exception."). Additionally, Defendant has not demonstrated that it can overcome any potential issues regarding hearsay within hearsay. *See United States v. Gurr*, 471 F.3d 144, 151 (D.C. Cir. 2006) ("Double hearsay . . . is excepted from the hearsay rule provided 'both the source and the recorder of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business.'"). Finally, given the lack of meaningful information about the records provided by Defendant, this Court cannot determine whether the "source of information or the method or circumstances of preparation indicate lack of trustworthiness." *See* FED. R. EVID. 803(6).

Defendant also has not established that the records in the TECS database meet the hearsay exception for public records and reports setting forth "the activities of a public agency" or "matters observed pursuant to duty imposed by law as to which there was a duty to report." *See* FED. R. EVID. 803(8). As a preliminary matter, the records in the TECS database are not public records; TECS is a secret database available only to law enforcement personnel, and

members of the public do not access, verify, or correct its contents. Defendant has not provided

this Court with a means to determine whether the "sources of information or other circumstances

exist that would indicate lack of trustworthiness." *See* FED. R. EVID. 803(8). Further, this Court

has no way to determine whether the exclusion of "matters observed by police officers and other

law enforcement personnel" that applies in criminal cases, *id.*, also applies when, as here, the

effect of allowing the government to withhold the requested records on the basis of an

unidentified "ongoing criminal investigation" is to defeat Dr. Barnard's Sixth Amendment right

of confrontation. *See United States v. Smith*, 521 F.2d 957, 966 n.20 (D.C. Cir. 1975) ("[T]he

admission of police records, which may at times contain written summaries of the prosecution's

entire case against a defendant poses more difficult Sixth Amendment problems. It is clear that

the mere existence of a hearsay exception does not cause the confrontation clause to recede.").

     A statement in a declaration that relies upon inadmissible hearsay is not sufficient to

support a motion for summary judgment. *See Commercial Drapery Contractors, Inc. v. United

States*, 133 F.3d 1, 7 (D.C. Cir. 1998). Indeed, "[t]he 'requirement of personal knowledge by the

affiant is unequivocal, and cannot be circumvented,' and [a]n affidavit based merely on

information and belief is unacceptable. Thus, statements that are impermissible hearsay,

conclusory or self-serving are generally precluded." *Judicial Watch, Inc. v. U.S. Dep't of

Commerce*, 224 F.R.D. 261, 263–64 (D.D.C. 2004) (granting motion to strike portions of

declaration offered by plaintiff in opposition to defendant's motions for summary judgment).

     The personal knowledge requirement of FED. R. CIV. P. 56(e) is all the more critical here

because Dr. Barnard has reason to believe that Defendant relied upon outdated or erroneous

information. In response to Dr. Barnard's FOIA/PA request to FBI for records dating back to

January 1, 2000, FBI provided, in June 2006, documents regarding two closed investigations, the

most recent of which involved a charity conference at which Dr. Barnard spoke nearly 7 years ago. (*See* Ex. 10.) Although FBI redacted certain portions of the documents and withheld others, the records and the exemptions cited by FBI establish that there is no currently ongoing investigation related to Dr. Barnard by that agency. (*See id.*)

Due to the exceedingly wide variety of individuals who would be in the TECS database,[2] it seems virtually certain that there are hundreds of thousands of individuals about whom the database would have some information. What is the likelihood that this entire database is currently accurate as to each of these hundreds of thousands of persons? Common sense tells us that while it is quite easy for names to get into this database, DHS cannot possibly have the resources to constantly check with all agencies that provide it with information as to whether that information was accurate as entered, and remains accurate. In fact, the system "is considered antiquated and unreliable by airport inspectors." Paul Sperry, *INS Inspector: Database of Terrorists Often Crashes*, WorldNetDaily.com, Aug. 23, 2002, http://www.worldnetdaily.com/news/article.asp?ARTICLE_ID=28697. It is hard to imagine a less reliable way of determining whether someone like Dr. Barnard, who may or may not have ever been a "person of interest" has become a person about whom the original reporting agency has no current interest.

The unreliability of Defendant's declaration is further exacerbated by Defendant's inability to maintain a consistent stance on the existence of any records responsive to Dr. Barnard's request. The first search of the TECS database performed by a Customs agency after

---

[2]     "Categories of individuals covered by the system are convicted/suspected violators of customs, immigration, banking, terrorism, arms and weapons, hazardous material, drug, or related laws; individuals who are suspected of, or who have been arrested for, thefts from international commerce; foreign nationals who are in the U.S. illegally; fugitives with outstanding warrants – Federal and State; victims of U.S. law violations; owners, operators and/or passengers of vehicles, vessels or aircraft traveling across U.S. borders; and individuals participating in financial transactions reportable under the Bank Secrecy Act (BSA), *inter alia*. Information of every description from a variety of Federal, State, and local sources that contributes to effective law enforcement may be maintained in the TECS system of records." Fields Decl. ¶ 15.

Dr. Barnard's travel problems began revealed no ongoing criminal investigation. (*See* Barnard

Decl. Ex. 1.) Additionally, prior to the initiation of this lawsuit, ICE stated that it had no records

responsive to Dr. Barnard's FOIA request. (*See* Fields Decl. Ex. 7.) After the initiation of this

lawsuit, however, ICE "supplemented" its response by claiming, without confirming their

existence, that any responsive records were exempt from disclosure in their entirety. (*See* Fields

Decl. Ex. 9.) Not until Defendant filed its motion for summary judgment did Dr. Barnard learn

that six pages of responsive records actually existed. (*See* Def.'s Mot. Summ. J. at 2.)

Having failed to provide a declaration, made upon personal knowledge, regarding an

ongoing investigation of Dr. Barnard, Defendant cannot expect this Court to accept its

unsupported and self-serving claim that there is such an investigation. Defendant has failed to

meet its burden of proving that it properly withheld the requested records due to an ongoing

criminal investigation.

      **B.**     **Defendant has failed to demonstrate that any and all exempt portions of the**
                **withheld records were non-segregable from the non-exempt portions.**

FOIA states that:

> Any reasonably segregable portion of a record shall be provided to any person
> requesting such record after deletion of the portions which are exempt under this
> subsection. The amount of information deleted shall be indicated on the released
> portion of the record, unless including that indication would harm an interest
> protected by the exemption in this subsection under which the deletion is made. If
> technically feasible, the amount of the information deleted shall be indicated at
> the place in the record where such deletion is made.

5 U.S.C. § 552(b). "[A]n agency cannot justify withholding an entire document simply by

showing that it contains some exempted material." *Mead Data Cent., Inc. v. Dep't of the Air

Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). To withhold an entire document, the agency must

demonstrate that the non-exempt portions of the document are "inextricably intertwined with

exempt portions." *Johnson v. Executive Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir.

2002). "A district court that simply approve[s] the withholding of an entire document without entering a finding on segregability, or the lack thereof, errs." *Krikorian v. Dep't of State*, 984 F.2d 461, 467 (D.C. Cir. 1993) (citations omitted).

A claim of non-segregability must be made with the same degree of detail required for a claim of exemption. *See Vaughn v. Rosen*, 484 F.2d 820, 827–28 (D.C. Cir. 1973). In addition to a statement of its reasons for claiming non-segregability, an agency should describe what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document. *Mead Data Cent.*, 566 F.2d at 261. The agency must adequately "correlate the claimed exemptions to particular passages" in the documents. *Schiller v. NLRB*, 964 F.2d 1205, 1209 (D.C. Cir. 1992). This segregability requirement applies to all documents and all exemptions in the FOIA. *Id.* (citation omitted).

Defendant failed to meet its burden of demonstrating that the exempt and non-exempt portions of the documents were inextricably intertwined. Defendant has not provided a statement of reasons for finding non-segregability, nor has Defendant described what proportion of the information in the requested records is non-exempt and how that material is dispersed throughout the records. Instead Defendant has provided conclusory assertions that merely restate the legal standards for non-segregability and for the exemptions that Defendant has claimed. (Def.'s Mot. Summ. J. at 12–13.) It is insufficient for Defendant to simply state "that the non-exempted materials were . . . inextricably intertwined with the exempt portions" (*id.* at 12); Defendant must demonstrate non-segregability by providing a detailed statement of reasons that sets forth the proportion of non-exempt information in the requested documents and explains the manner in which that material is dispersed throughout the documents, none of which Defendant has done here. Thus, this Court should reject Defendant's claim of non-segregability.

IV.    **CONCLUSION**

      For all of the above stated reasons, this Court should grant Dr. Barnard's motion for

summary judgment and deny Defendant's motion for summary judgment.

                                Respectfully submitted,

                                /s/ Daniel Kinburn

                                _____

                                Daniel Kinburn
                                PHYSICIANS COMMITTEE FOR
                                 RESPONSIBLE MEDICINE
                                5100 Wisconsin Avenue, N.W., Suite 400
                                Washington, D.C. 20016
                                Attorney for Plaintiff
                                (202) 686-2210 ext. 308
                                (202) 686-2155 (fax)

Dated: March 15, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NEAL D. BARNARD, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 06-CV-1393 (CKK) |
| | ) | |
| DEPARTMENT OF HOMELAND SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF MATERIAL FACTS AS TO
## WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Rules 7.1(h) and 56.1, Plaintiff submits its statement of material facts as to which there is no genuine issue, and Plaintiff responds to Defendant's statement of material facts as to which it claims that there is no genuine issue.

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

1.      Dr. Barnard is the president and founder of the Physicians Committee for Responsible Medicine ("PCRM"), a 501(c)(3) public charity that advocates for preventive medicine through better nutrition and promotes more effective, ethical, and compassionate scientific research. (Barnard Decl. ¶ 1.) Dr. Barnard is the author of several dozen publications in scientific and medical journals as well as numerous nutrition books for lay readers, and he is frequently called on by news programs to discuss issues related to nutrition, research, and other areas of modern medicine. (*Id.*) His activities are reported to PCRM's membership of over 100,000 physician and lay members via PCRM's quarterly publication, *Good Medicine*, its Website, and regular mailings to its membership. (*Id.*)

2.      Beginning in January 2003, with no explanation whatsoever, federal law enforcement officials began subjecting Dr. Barnard to detention and searches during after international travel. (*Id.* ¶ 2.)

3.      In a time span of less than three years, Dr. Barnard was detained, questioned, and/or searched at least twelve times:

> January 4, 2003: U.S. Customs and Border Protection ("CBP") officials questioned, searched, and delayed Dr. Barnard for 20 minutes upon his return from vacation abroad. Officials informed him that his passport had been flagged for scrutiny;

> May 10, 2003: CBP officials detained Dr. Barnard at Toronto Pearson International Airport for 20 to 30 minutes, interrogated him about the nature of his work, and searched his belongings. At this time, Dr. Barnard observed "Terrorist Organization Member - Caution" in large block letters on the CBP computer screen;

> June 3, 2003: CBP officials searched and questioned Dr. Barnard at Dulles International Airport for 30 minutes upon his return from a vacation in Europe. Officials searched Dr. Barnard's baggage and removed, to make photocopies, a personal calendar and address book, correspondence, and a job applicant's résumé;

> July 16, 2003: CBP officials detained Dr. Barnard in the screening room at Toronto Pearson International Airport for questioning for more than 20 minutes;

> August 28, 2003: CBP officials, including Officers Weimer and Hanna, delayed and screened Dr. Barnard for 15 minutes at Toronto Pearson International Airport, at which time Dr. Barnard observed the "Terrorist Organization Member" notice on the CBP computer screen;

> January 3, 2004: CBP Officers Tweed and Grove stopped Dr. Barnard at Dulles International Airport upon his return from the United Kingdom and searched his baggage;

> September 10, 2004: Upon Dr. Barnard's return from a trip to Belgium and France, CBP Officer Berg marked a yellow line on Dr. Barnard's customs card, after which Officer Greskovic searched his baggage;

> January 1, 2005: CBP officials delayed Dr. Barnard for 30 minutes upon his return from a trip to the United Kingdom. After Officer Messina marked a yellow

2

line on Dr. Barnard's customs card, Officers Cromwell and Perlas searched his baggage;

May 13, 2005: Police officers briefly detained Dr. Barnard as he checked in with Air France at Dulles International Airport because his name appeared on a "no-fly" list;

May 28, 2005: CBP officials delayed Dr. Barnard for 12 minutes at Dulles International Airport upon his return from France. Officer Wilkinson marked a yellow line on Dr. Barnard's customs card and Officers Stuart and Greene, assisted by a third officer, checked his passport, after which Officer Stuart searched his baggage;

August 27, 2005: CBP Officers Ulloa, Miller, Comas, and Brodie delayed, questioned, and searched Dr. Barnard for 20 minutes at Dulles International Airport upon his return from Marseilles;

September 22, 2005: While checking in at Dulles International Airport, Dr. Barnard learned from United Airlines that his name matched the name of a person on the "no-fly" list. Dr. Barnard was later sidelined for screening and inspected by Earle Biassey.

(*Id.* ¶¶ 3–14.)

4.    These incidents occurred during each and every one of Dr. Barnard's travels

abroad between January 2003 and September 2005. (*Id.* ¶ 15.)

5.    Since filing the FOIA/PA request that led to the initiation of this lawsuit, Dr.

Barnard has been detained, questioned, and/or searched during international travel several more

times:

- May 30, 2006: After returning from a trip to France and Croatia, Dr. Barnard's customs card was yellow-lined, and he was sent to stand in the line for baggage search. He was delayed for approximately 35 minutes.

- July 4, 2006: Dr. Barnard arrived at Dulles International Airport after a trip to London. Officer George yellow-lined his customs card, after which Officer Clerkin inspected his baggage.

- July 14, 2006: While returning to the United States from Toronto, Dr. Barnard was detained by officials at Toronto Pearson International Airport for two hours. Officer Mazzuoccolo screened his passport and escorted him to a waiting room, where Officers Watkins and Takak questioned him and asked him to fill out a

3

form. They questioned Dr. Barnard about his employment, the reasons for his trip, and any location(s) where he had stayed in Canada. They later left Dr. Barnard in this room for an extended period while they awaited telephone authorization to release me.

- September 2, 2006: Upon his arrival at Dulles International Airport from a vacation trip to Italy, Dr. Barnard was initially screen by Officer Harvey, who did not initially yellow-line Dr. Barnard's customs card. After Dr. Barnard left the screening area and began waiting for his luggage, Officer Harvey approached him, took his passport, and marked a large "C" on his card. Officer Harvey then left for several minutes, after which he returned with the passport and told Dr. Barnard that he would need to undergo additional screening. Dr. Barnard proceeded to the additional screening area where Officers Cromwell and Wilson searched his luggage. This process lasted approximately 40 minutes.

- January 6, 2007: Upon Dr. Barnard's arrival at Dulles International Airport from a vacation in the United Kingdom, Officer Suarez conducted the initial passport screening and yellow-lined Dr. Barnard's customs card. After retrieving his checked luggage, Dr. Barnard was sent to lane C for questioning. There, Officer McEvoy read through the computer record, left for several minutes, returned with Dr. Barnard's passport, and allowed him to leave.

(*Id.* ¶¶ 16–20.)

6.      Prior to January 2003, Dr. Barnard experienced no such problems and had no reason to think that he was considered by law enforcement authorities to be anything but a law-abiding citizen—certainly not a "Terrorist Organization Member." (*Id.* ¶ 21.)

7.      To the best of his knowledge Dr. Barnard never has been questioned, followed, or monitored by law enforcement officials in a manner other than that described above. (*Id.* ¶ 22.)

8.      No law enforcement agency has ever requested that Dr. Barnard provide records, fingerprints, or DNA samples for the purposes of an investigation of any sort. (*Id.* ¶ 23)

9.      Dr. Barnard knows of no occasion in which his friends, family members, or colleagues were questioned or monitored as a result of an investigation of his activities. (*Id.* ¶ 24.)

10.    In an effort to put an end to these inconvenient and embarrassing interruptions to his travel schedule, Dr. Barnard, at various times, sought records pertaining to monitoring, surveillance, or investigation of his activities from a number of federal law enforcement authorities: U.S. Customs Service (January 9, 2003; August 8, 2003); Federal Bureau of Investigation ("FBI") (August 8, 2003; March 21, 2006); U.S. Customs and Border Protection ("CBP") (July 20, 2005); Immigration and Customs Enforcement ("ICE") (March 21, 2006); and Transportation Security Administration (July 13, 2006). (*Id.* ¶ 20; Barnard Decl. Exs. 1–7.)

11.    By letter dated January 16, 2003, and in response to Dr. Barnard's request of January 9, 2003, U.S. Customs Service informed Dr. Barnard that it had searched the Treasury Enforcement Communications System ("TECS") and identified two possible reasons for the change in "the routine nature of [his] Customs processing." (Barnard Decl. Ex. 1.) Customs cited both an "elevated level of scrutiny" due to the terrorist attacks of September 11, 2001, and a "random selection process that is directly based on travel frequency." (*Id.*) Customs did not report an ongoing criminal investigation of Dr. Barnard. (*See id.*)

12.    After Dr. Barnard filed this lawsuit, he received ICE's letter dated August 5, 2006. (Barnard Decl. ¶ 28.)

13.    On March 21, 2006, Dr. Barnard filed a request with FBI for records relating to any monitoring, surveillance, observation, questioning, interrogation, and/or investigation of his activities from January 1, 2000, until the time of the request, a period exceeding the span covered by his similar request to ICE. (*See* Barnard Decl. Ex. 4.)

14.    In response, FBI provided records showing that Dr. Barnard has been somehow involved in two FBI "investigations": the first took place during mid-1996, when Dr. Barnard

received a death threat from an unknown source, and the second occurred in May 2000 when

FBI researched a list of speakers scheduled to appear at a charity conference that year. (Ex. 10.)

15.     The unredacted portions of FBI's 27-page response demonstrate that all records

associated with the two "investigations" date from within a month of when FBI opened the

"investigations." (*See id.*)

16.     As support for redacting and withholding pages, FBI cited FOIA exemptions

(b)(2) for agency personnel rules and practices, (b)(6) for privacy concerns for personnel and

medical files, (b)(7)(C) for personal privacy, and (b)(7)(D) for the identities of and information

provided by confidential sources, but not (b)(7)(A) or (b)(7)(E). (*See id.*)

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## STATEMENT OF MATERIAL FACTS

¶ 1. By letter dated July 20, 2005, Plaintiff Neal D. Barnard submitted a FOIA/PA

request to the U.S. Customs and Border Patrol ("CBP") requesting all records pertaining to him.

Response: Admitted.

¶ 2. On August 15, 2005, the CBP informed Plaintiff that records responsive to his

request fell under the purview of the U.S. Immigration and Customs Enforcement ("ICE").

Response: Admitted.

¶ 3. By letter dated March 21, 2006, Plaintiff submitted a FOIA/PA request to ICE

requesting "any records created from January 1, 2002 to the present that were prepared, received,

transmitted, collected and/or maintained by Immigration and Customs Enforcement relating to

the following: … [fifteen (15) specifically enumerated areas]."

Response: Admitted.

¶ 4. ICE acknowledged Plaintiff's March 21, 2006 FOIA request in a letter dated May 1,

2006.

Response: Admitted.

¶ 5. By letter dated May 16, 2006, Plaintiff filed an appeal with the DHS Privacy Office because ICE had not acted on Plaintiff's FOIA request.

Response: Admitted.

¶ 6. By letter dated June 28, 2006, the U.S. Department of Homeland Security Privacy Office responded and explained, "By copy of this letter, I am informing ICE FOIA personnel of your appeal. The delay you have encountered is largely a result o[f] resource constraints, which ICE is working very hard to correct. Until ICE responds to your initial request, however, my office cannot take further action on your appeal as we do not have the staff resources ourselves to conduct initial record reviews for DHS components."

Response: Admitted.

¶ 7. Thereafter, on August 5, 2006, ICE responded to Plaintiff's March 21, 2006 FOIA request, advising him that it does not have any records responsive to his request.

Response: Admitted.

¶ 8. Defendant conducted additional search for records responsive to Plaintiff's FOIA requests by entering Plaintiff's name into the Treasury Enforcement Communications System ("TECS"). The TECS search located six (6) pages of records responsive to Plaintiff's request when printed to hardcopy. The TECS is the only system of records maintained by ICE where records responsive to plaintiff's FOIA request would likely be located.

Response: Admitted.

¶ 9. On November 16, 2006, ICE supplemented its response and further advised Plaintiff that any records responsive to his request were exempt from disclosure, in their entirety, pursuant to exemptions (b)(2), (b)(7)(A), (b)(7)(C) and (b)(7)(E) of the FOIA.

7

<u>Response</u>: Admitted.

Respectfully submitted,

/s/ Daniel Kinburn

_____
Daniel Kinburn
PHYSICIANS COMMITTEE FOR
 RESPONSIBLE MEDICINE
5100 Wisconsin Avenue, N.W., Suite 400
Washington, D.C. 20016
Attorney for Plaintiff
(202) 686-2210 ext. 308
(202) 686-2155 (fax)

Dated: March 15, 2007