## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NEAL D. BARNARD, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No.: 06-1393 (CKK) |
| | ) | ECF |
| DEPARTMENT OF HOMELAND | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF SHARI SUZUKI

I, Shari Suzuki, declare as follows:

1.     I am the Freedom of Information Act (FOIA) Appeals Officer, and Chief of the

FOIA Appeals, Policy and Litigation Branch (FAPL), Regulations and Rulings, Office of

International Trade (OT), U.S. Customs and Border Protection (CBP), U.S. Department

of Homeland Security (DHS) (formerly the U.S. Customs Service, U.S. Department of

the Treasury).[1]  Since April 2, 2006, I am the official charged with the following

responsibilities: (1) giving guidance and instruction to CBP personnel regarding the

processing of FOIA requests; (2) adjudicating administrative appeals that concern FOIA

requests; and (3) overseeing all CBP activities related to information disclosure under the

FOIA.

2.     I make this declaration on the basis of my review of the official files and records

of this office, my personal knowledge of the internal operations of this office and agency,

---

[1] Effective March 1, 2003, the United States Customs Service was renamed the Bureau of Customs and Border Protection. See Reorganization Plan Modification for the Dep't of Homeland Security, H.R. Doc. 108-32 at 4 (2003).  In April 2007, the Bureau of Customs and Border Protection was officially renamed U.S. Customs and Border Protection, which remains the agency's name to date.

and information acquired by me in the course of the performance of my official duties.

3.    Due to the nature of my official duties, I am familiar with the procedures followed by CBP in responding to requests for information from its files pursuant to FOIA; specifically, I am aware of the treatment which has been afforded the FOIA request of the plaintiff, Dr. Neal Dana Barnard, for access to all records pertaining to himself in the custody of CBP.

4.    The purpose of this declaration is to inform the Court and Plaintiff with an explanation of the procedures used in the review and processing of the CBP records that are responsive to Plaintiff's July 20, 2005, FOIA request.  In accordance with <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973), this declaration and its attachments, the <u>Vaughn</u> Indices, provide the Court and Plaintiff with an identification of information that is withheld, the statutory exemption(s) claimed, and the justification for asserting the exemptions.

### PLAINTIFF'S FOIA REQUEST AND CBP'S SEARCH FOR RECORDS

5.    By letter dated July 20, 2005, plaintiff submitted a FOIA request to CBP for "all records about me that are in IBIS or any other system used by the Bureau of Customs and Border Protection at any and all ports of entry to the United States."

6.    Upon discovering that Plaintiff's July 20, 2005, request was processed as a traveler redress complaint instead of being processed under the FOIA, CBP personnel in the Office of Field Operations (OFO) conducted an initial search of the Treasury Enforcement Communications System (TECS) on January 17, 2008, and initially found 82 pages of documents responsive to Plaintiff's request.  The following search terms were used: "Neal," "Barnard," "Bernard," and "07/10/53."

2

7.    TECS is an overarching law enforcement information collection, risk assessment, and information sharing environment. It is also a repository for law enforcement and investigative information. TECS is comprised of several modules that collect, maintain and evaluate screening data, conduct targeting analysis, and make information available to appropriate law enforcement officers of the U.S. government. The Interagency Border Inspection System (IBIS) is not a separate system; rather it was a term used for the method by which other agencies outside CBP (and previously, the U.S. Customs Service) accessed TECS and other external databases made available through TECS. IBIS also referred to the functionality developed in TECS to support the legacy Immigration and Naturalization (INS) inspections process. The term IBIS has largely ceased to be used since the formation of DHS, being replaced by a general reference to TECS.

8.    FAPL processed the 82 pages of responsive documents and released 80 pages with redactions to Plaintiff on February 5, 2008, withheld one (1) page in full and released one (1) page in full.   (Government's Exhibit A — cover letter).

9.    CBP discovered one (1) additional TECS record and released that to Plaintiff with redactions on April 1, 2008.  (Government's Exhibit B — cover letter).

10.    In addition to searching TECS, CBP conducted searches of the Automated Targeting System – Passenger (ATS-P) as well as records maintained at CBP Headquarters, and the Ports of Entry for Toronto and Washington-Dulles.  The port of Washington-Dulles records were searched on February 15, 2008 and the port of Toronto records were searched on April 1, 2008.  No records were found at the port of Washington-Dulles and five (5) pages of records were found at the port of Toronto.  The ATS-P was searched by CBP personnel at Headquarters on January 29, 2008.  Upon

3

review of the records that resulted from the January 29, 2008 search of ATS-P, CBP

personnel at Headquarters conducted an additional search on April 8, 2008 to ensure that

the search was comprehensive. The following search terms were used: "Neal,"

"Barnard," "Bernard," and "07/10/1953."

11.    The ATS-P is a module of the Automated Targeting System (ATS) and is used at

all U.S. airports and seaports receiving international flights and voyages to conduct risk

assessments of passengers and crewmembers prior to their arrival in or departure from

the United States. It assists the CBP officer's decision-making process about whether a

passenger or crewmember should receive additional screening prior to entry or departure

because the traveler may pose a greater risk for violation of U.S. law. ATS-P's screening

relies upon the following databases: Advanced Passenger Information System (APIS),

Non Immigrant Information System (NIIS), Suspect and Violator Indices (SAVI), the

Department of State visa databases, Passenger Name Record (PNR) information from the

airlines, TECS crossing data, TECS seizure data, and information from the consolidated

and integrated terrorist watch list maintained by the Terrorist Screening Center (TSC).

ATS-P processes available information from these databases to develop a risk assessment

for each traveler. The automated risk assessment is based on a set of national-and user-

defined rules that are comprised of criteria that pertain to specific operational/tactical

objectives or local enforcement efforts.

12.    As a result of these searches of ATS-P, CBP Headquarters and ports of Toronto

and Washington-Dulles, CBP located an additional 229 pages of responsive records.

FAPL processed the 229 pages of responsive records and on April 17, 2008, CBP

provided a final release of records to Plaintiff. Of the 229 pages of responsive records,

4

82 pages were provided with redactions. 11 pages were released in full and 136 pages were withheld in full. (Government's Exhibit C — cover letter).

13.    On April 23, 2008, CBP provided to Plaintiff two <u>Vaughn</u> indices accounting for exemptions applied to the records released in part and withheld in full.

14.    On June 4, 2008, CBP reduced the number of exemptions applied to the records released in part and withheld in full, and CBP provided to Plaintiff two revised <u>Vaughn</u> indices, which reflected this change.

15.    On June 6, 2008, ICE provided CBP with thirteen (13) additional pages of responsive records which ICE employees had located in their files.[2] Three (3) pages are Plaintiff's Customs Declarations. The remaining ten (10) pages are TECS records which are substantively the same as those previously released to Plaintiff at Bates Stamp Numbers 25-26, 28-29. Because the records received from ICE were printed in a different format and on different dates these records were not considered to be duplicates of the records previously released. On June 16, 2008, CBP provided Plaintiff with 13 pages of records with redactions (Bates Stamp Numbers 301-303, 304-313). (Government's Exhibit D — cover letter).

16.    On June 20, 2008, CBP provided to Plaintiff a final and complete <u>Vaughn</u> Index for documents released in part, which included an explanation of the FOIA exemptions claimed over the documents that had been provided to CBP by ICE. This <u>Vaughn</u> index is included as part of this declaration (Government's Exhibit E). Government's Exhibit E accounts for all records released in part to Plaintiff. In addition, Government's Exhibit F is a <u>Vaughn</u> index that accounts for all records withheld in full.

---

[2] Although ICE referred fourteen (14) pages of records to CBP, CBP determined that one page was actually an ICE record and, thus, was inadvertently referred to CBP. Upon consultation with ICE, however, the record was nonetheless deemed to be non-responsive.

5

**EXPLANATION OF FOIA EXEMPTIONS ASSERTED**

17.    In total, CBP has released to plaintiff 176 pages of records with redactions (Government's Exhibit E) and has withheld in full 137 pages of records pursuant to FOIA exemptions (b)(2), (b)(4), (b)(6), (b)(7)(C) and (b)(7)(E).

### A. Exemption (b)(2): information related solely to the internal personnel rules and practices of an agency

18.    Section 552(b)(2) of Title 5 of the U.S. Code exempts from mandatory disclosure matters that are "…related solely to the internal personnel rules and practices of an agency." Exemption (b)(2) encompasses two distinct categories of information: (a) internal matters of a relatively trivial nature, sometimes referred to as "low 2" information, and (b) more substantial internal matters the disclosure of which would risk circumvention of a legal requirement, sometimes referred to as "high 2" information. With respect to "high 2" information, the intent of exemption (b)(2) is that disclosure should not benefit those attempting to violate the law and avoid detection. The use of Exemption (b)(2) in this case involves both "low 2" and "high 2" information.

19.    The "low 2" information withheld pursuant to Exemption (b)(2) consists of administrative markings such as codes indicating inspection results, referring officer codes, record ID numbers, terminal identification numbers and computer function codes that instruct TECS and ATS-P and other computer system users on how to navigate their way through the system.

20.    The low (b)(2) redactions are found in Bates Stamp numbers 001-142, 301-313 in Government's Exhibit E and 164-300 in Government's Exhibit F. These markings are purely internal and are utilized by CBP to assist in the access, use and control of CBP

6

databases. These markings are used exclusively for the purposes of indexing, storing,

locating, retrieving and distributing information in the CBP databases. As access to the

file and computer systems is restricted from the public, the public has little or no interest

in this information such as the internal identification codes, record identification

numbers, fax and telephone numbers and computer codes. In addition, knowledge of

internal agency computer system codes could facilitate improper access to sensitive CBP

records and interfere with CBP's ability to maintain control of its information systems.

Additionally, disclosure of this information would not in any way fulfill the purposes of

the FOIA—which is to open agency action to the light of public scrutiny.

21.    The "high 2" information withheld pursuant to Exemption (b)(2) is predominantly

internal and does not impact, in any substantive manner, upon plaintiff. This "high 2"

information consists of internal matters and includes examination and inspection

procedures, internal reporting requirements and instructions on how to process

international travelers. Disclosure of this information would permit potential violators to

whom the documents may be disclosed, to develop countermeasures to evade detection,

inspection and targeting methods. Public awareness of this operational information

would aid those who seek to circumvent CBP operations and thus harm the agency's

ability to enforce the laws of the U.S. For example, on Bates Stamp numbers 008-024 in

the TECS II Person Subject Display records, the remarks section contains instructions on

how to process an international traveler and is withheld under high (b)(2) as well as

(b)(7)(E). (See Government's Exhibit E). Any further detailed description of the

information withheld pursuant to high (b)(2) would divulge to Plaintiff the examination

and inspection procedures, internal reporting requirements and instructions on how to

7

process international travelers, the very information that CBP seeks to protect. The high (b)(2) redactions are found in Bates Stamp numbers 001-003, 005-031, 033-052, 054-142, 302, 304-313 in Government's Exhibit E and 164-300 in Government's Exhibit F. Not only are we asserting that information found within Bates Stamp numbers 164-300 is exempt from disclosure under high (b)(2), we are also asserting that the documents in and of themselves are law enforcement techniques. The documents are the means by which law enforcement activities are coordinated and reported. They are protected by high (b)(2) because disclosure would reveal CBP targeting, examination and inspection procedures and permit potential violators to whom the documents may be disclosed to understand the precise steps taken by CBP, thus facilitating the development of countermeasures to evade detection, inspection and targeting methods. To the extent that there is any non-exempt information in Bates Stamp numbers 164-300, we assert that after conducting a line-by-line review, it is inextricably intertwined to the exempt information and therefore no portions can be segregated and disclosed. The few non-exempt words and phrases that are dispersed throughout the records withheld in full, if disclosed, would be meaningless and would not serve the purpose of FOIA--to open agency action to the light of public scrutiny.

### B. Exemption (b)(4): trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential

22.    Section 552(b)(4) of Title 5 of the U.S. Code exempts from disclosure "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." The exemption is intended to protect the interests of both the government and the provider of information. The exemption affords protection to those

8

information providers who are required to furnish commercial or financial information to the government by safeguarding them from the competitive disadvantages that could result from disclosure. Two different legal standards are applicable to commercial information depending on whether it was obtained by the agency voluntarily or involuntarily. In this case, the information redacted pursuant to Exemption (b)(4) was submitted pursuant to a legal mandate.

23.      For information submitted pursuant to a legal mandate, it is considered to be confidential where disclosure of the information is likely to either (1) "impair the Government's ability to obtain necessary information in the future", or (2) "cause substantial harm to the competitive position of the person from whom the information was obtained." National Parks & Conservation Ass'n v. Morton, 498 F.2d 765, 770 (D.C. Cir. 1974).

24.      The information withheld pursuant to Exemption (b)(4) is found in Bates Stamp numbers 143-163 and consists of Passenger Name Record (PNR) data obtained from commercial carriers for the purpose of assessing the risk of international travelers. Section 115 of Aviation and Transportation Security Act (ATSA) requires that carriers must make PNR information available to the Customs Service upon request. Public Law 107–71, 115 Stat. 597, amending 49 U.S.C. § 44909. While air carriers are not required to collect PNR in their reservation and departure control systems, to the extent PNR is collected, air carriers are required to provide CBP with access to it pursuant to a CBP regulation. 19 C.F.R. §122.49d. The air carrier information redacted in Bates Stamp numbers 146, 147, 149, 150, 151, 155, consists of unique rules associated with the business relationship between an individual customer and the air carrier. The release of

9

these rules would disclose information regarding special treatment that an air carrier

provides to a passenger to retain the passenger's business, and an air carrier's competitor

could use this information to identify concessions that the airline is willing to make on a

specific route. Therefore, the release of this information would disclose the air carrier's

confidential business information, impairing the ability of the government to collect this

information in the future and would harm the competitive position of the air carriers.

### C. Exemption (b)(6): information about individuals in personnel, medical and similar files the disclosure of which would constitute an unwarranted invasion of personal privacy

25.     Section 552(b)(6) of Title 5 of the U.S. Code exempts from disclosure personnel

and medical files and similar files the release of which would constitute a clearly

unwarranted invasion of personal privacy. This protection is afforded to information that

would infringe on the personal privacy of individuals about whom it pertains. The

United States Supreme Court in United States v. Washington Post Co., 456 U.S. 595

(1982) stated in reliance on legislative history of the FOIA that the phrase "personnel and

medical and similar files" was to be broadly interpreted. Once the threshold requirement

is met, Exemption (b)(6) requires a balancing of the public's right to know against an

individual's right to privacy to determine whether disclosure of the records at issue would

constitute a clearly unwarranted invasion of a person's privacy. U.S. Dep't of the Air

Force v. Rose, 425 U.S. 352 (1976).

26.     In this case, the federal employees' (including CBP employees and officers) and

third parties' right to have his or her name, position, social security numbers and other

identifying information withheld from disclosure outweighs the public's interest in

knowing this information. And, Plaintiff has not, to date, demonstrated any public

10

interest in the disclosure of the identifying information. The privacy consideration here is to protect federal personnel and third parties, as individuals. from unnecessary. unofficial questioning, harassment and stigmatization. Further, disclosing the information redacted pursuant to (b)(6) in this case does not shed light on how CBP performs its statutory duties. Thus, Exemption (b)(6) is applied to withhold the names. telephone numbers, social security numbers and other identifying markings of federal personnel and third parties. This information was withheld from the following Bates Stamp numbers in Government's Exhibit E, Bates Stamp numbers 001-002, 008-009, 011, 013-031, 033-052, 054-068, 070, 072, 074, 075, 077. 079, 084, 143-163. 301-302. 304-313; and in Government's Exhibit F. Bates Stamp numbers 164-188, 190-199, 201-227, 231, 232, 234, 236, 253, 258-259, 261, 272-275, and 286-287.

### D. Exemption (b)(7): records or information compiled for law enforcement purposes

27.    Section 552(b)(7) of Title 5 of the U.S. Code provides that FOIA applies to "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, [or] . . . (E) would disclose techniques and procedures for law enforcement investigations or prosecutions. or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."

28.    CBP is a law enforcement agency with enforcement responsibilities for over 400 Federal statutes, on behalf of over 40 different federal agencies. CBP's mission is to protect the borders of the United States against terrorists and the instruments of terror,

11

enforce the customs and immigration laws of the United States, and foster our Nation's economy by facilitating lawful international trade and travel. Its mission includes the processing of passengers, conveyances, and merchandise entering, transiting and departing the United States. The creation and implementation of effective law enforcement systems and procedures is paramount to achieving this mission. TECS, ATS-P and the port of Toronto maintain records directly related to law enforcement activities and are all used for law enforcement purposes. As previously mentioned, TECS is an overarching law enforcement information collection, risk assessment, and information sharing environment; ATS-P's purpose is to assist CBP personnel in making decisions about whether a passenger or crewmember should receive additional screening prior to arrival in or departure from the United States because the traveler may pose a greater risk for violation of U.S. law. The responsive records found at the port of Toronto as well as at Headquarters are used for law enforcement purposes.

      **(1)    5 U.S.C. § 552(b)(7)(C): records or information compiled for law enforcement purposes which could reasonably be expected to constitute an unwarranted invasion of personal privacy**

29.    Section 552(b)(7)(C) of Title 5 of the U.S. Code exempts from mandatory disclosure "records or information compiled for law enforcement purposes" the disclosure of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy." In asserting this exemption, each piece of information was scrutinized to determine the nature and strength of any individual's privacy interest. In withholding the information, the individual's privacy interest is balanced against the public's interest in disclosure. In each instance, it was determined that whatever public interest there might be, if any, in knowing the names of the individuals identified in the

relevant records, that public interest did not outweigh the privacy interests of said individuals. This exemption protects the identity of law enforcement personnel and third parties referenced in files compiled for law enforcement purposes. The exemption is intended to protect law enforcement personnel from harassment and annoyance in their private lives due to the conduct of their official duties, which could conceivably result from public disclosure of their identity. The exemption is also intended to protect third parties, whose identities are revealed in law enforcement files, from comment, speculation, and stigmatizing connotation associated with being identified in a law enforcement record. "'[S]trong privacy interests [are] inherent in law enforcement records," and the categorical withholding of information contained in law enforcement records that identify third parties is well-established. Summers v. U.S. Dep't of Justice, 517 F.Supp.2d 231, 243 (D.D.C. 2007) (quoting SafeCard Servs., Inc. v. S.E.C., 926 F.2d 1197, 1206 (D.D.C. 1991)).

30.      As previously mentioned in the discussion of Exemption (b)(6), in this case, the federal employees' (including CBP employees) and third parties' right to have his or her name, position, social security numbers and other identifying information withheld from disclosure outweighs the public's interest in knowing this information. And, Plaintiff has not, to date, demonstrated any public interest in the disclosure of the identifying information. The privacy consideration here is to protect federal personnel and third parties as individuals from unnecessary, unofficial questioning, harassment and stigmatization. Further, disclosing the information redacted pursuant to (b)(7)(C) in this case does not shed light on how CBP performs its statutory duties. Thus, Exemption (b)(7)(C) is applied to withhold the names, telephone numbers, social security numbers

13

and other identifying markings of federal personnel and third parties. This information

was withheld from the following Bates Stamp numbers in Government's Exhibit E, Bates

Stamp numbers 001-002, 008-009, 011, 013-031, 033-052, 054-068, 070, 072, 074, 075,

077, 079, 084, 143-163, 301-302, 304-313; and in Government's Exhibit F, Bates Stamp

numbers 164-188, 190-199, 201-227, 231, 232, 234, 236, 253, 258-259, 261, 272-275,

and 286-287.

> **(2)    5 U.S.C. § 552(b)(7)(E): records or information
> compiled for law enforcement purposes which would
> disclose techniques and procedures for law enforcement
> investigations or prosecutions, or would disclose
> guidelines for law enforcement investigations or
> prosecutions if such disclosure could reasonably be
> expected to risk circumvention of the law**

31.    Section 552(b)(7)(E) of Title 5 of the U.S. Code exempts from mandatory

disclosure "records or information compiled for law enforcement purposes" the

disclosure of which "would disclose techniques and procedures for law enforcement

investigations or prosecutions, or would disclose guidelines for law enforcement

investigations or prosecutions if such disclosure could reasonably be expected to risk

circumvention of the law." In this case, CBP has withheld information that would reveal

CBP's investigative techniques, disclosure of which would reveal CBP examination and

inspection procedures, internal reporting requirements and instructions on how to process

international travelers, which could be used by potential violators to develop

countermeasures to evade detection, inspection and targeting methods. For example, in

Bates Stamp numbers 033-049, the TECS II Secondary Inspection printouts, the details

reported are inspection results as reported by CBP Officers. (See Government's Exhibit

E). Public awareness of this operational information would aid those who seek to

circumvent CBP operations and thus harm the agency's ability to enforce the laws of the U.S. Any further detailed description of the information withheld pursuant to (b)(7)(E) would divulge to Plaintiff the examination and inspection procedures, internal reporting requirements and instructions on how to process international travelers, the very information that CBP seeks to protect. The (b)(7)(E) redactions are found in Bates Stamp numbers 001-003, 005-031, 033-052, 054-142, 302, 304-313 in Government's Exhibit E and 164-300 in Government's Exhibit F. Not only are we asserting that information found within Bates Stamp numbers 164-300 is exempt from disclosure under (b)(7)(E), but we are also asserting that the documents in and of themselves are law enforcement techniques. The documents are the means by which law enforcement activities are coordinated and reported. They are protected by (b)(7)(E) because disclosure would reveal CBP targeting, examination and inspection procedures and types of any intra and inter-agency coordination, which would permit potential violators to whom the documents may be disclosed, to understand the precise steps taken by CBP thus facilitating the development of countermeasures to evade detection, inspection and targeting methods. To the extent that there is any non-exempt information in Bates Stamp numbers 164-300, we assert that after conducting a line-by-line review, it is inextricably intertwined to the exempt information and, therefore, no portions can be segregated and disclosed. The few non-exempt words and phrases that are dispersed throughout the records withheld in full, if disclosed, would be meaningless and would not serve the purpose of FOIA--to open agency action to the light of public scrutiny.

### Segregability

32.    All information withheld is exempt from disclosure pursuant to a FOIA

exemption or is not reasonably segregable because it is so intertwined with protected material that segregation is not possible or its release would have revealed the underlying protected material. I have reviewed the records that have been released to Plaintiff in response to this litigation and determined the released documents are responsive. I have reviewed the documents line-by-line, to identify information exempt from disclosure or for which a discretionary waiver of exemption could apply, and I am satisfied that all reasonably segregable portions of the relevant records have been released to the Plaintiff in this matter. In my determination, any further release of the exempted materials could reasonably lead to the identification of the individuals or other items that are properly protected by the exemptions asserted.

**JURAT CLAUSE**

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge, information and belief.

Signed this 25th day of June, 2008.

Shari Suzuki, Branch Chief
FOIA Appeals, Policy and Litigation
Office of International Trade, Regulations and Rulings
U.S. Customs and Border Protection
U.S. Department of Homeland Security